UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
COMMONWEALTH OF MASSACHUSETTS,   )
   )
                Plaintiff,   )
   )
v.   )
   )
FEDERAL HOUSING FINANCE AGENCY,   )      CASE NO. 1:14-cv-12878 (RGS)
FEDERAL HOME LOAN MORTGAGE   )
CORPORATION, and FEDERAL NATIONAL   )
MORTGAGE ASSOCIATION,   )
   )
                Defendants.   )
_____)

# OPPOSITION TO DEFENDANTS' MOTION
# TO DISMISS THE COMMONWEALTH'S COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF UNDERLYING FACTS ......................................................................... 1

    A. The Applicable State Foreclosure and Loan Modification Law: A Balanced
       Response to Homeowners and Communities in Crisis .......................................... 1

    B. The Business of the GSEs and the GSEs' Servicing Guides .............................. 2

    C. The GSEs' "Arm's Length Transaction" Servicing Requirement ...................... 3

    D. The GSEs' "Make Whole Requirement" Concerning REO Property Sales ........ 4

    E. FHFA's Creation and Its Two Distinct Roles in Overseeing the GSEs ............. 5

    F. FHFA Assumes Conservatorship of the GSEs ................................................... 6

LEGAL ARGUMENT .............................................................................................................. 7

I. HERA DOES NOT PROHIBIT JUDICIAL REVIEW ............................................. 7

    a. FHFA Took No Action In This Case ................................................................. 7

    b. Any "Action" Taken by FHFA Was As Regulator, Not Conservator ............... 8

       1. Courts Have Recognized the Limits of FHFA's Conservator Authority ........... 9

    c. The GSE Guidelines Do Not Fall Within FHFA's Limited Conservator Authority ......... 11

II. THE NON-PROFIT BUYBACK PROVISION IS A FORECLOSURE AND
    PROPERTY CONVEYANCE LAW WITHIN THE STATE'S POLICE POWERS AND
    IS NOT PREEMPTED BY HERA ....................................................................... 12

    a. HERA's Express Language Does Not Preclude a State's Enforcement of its Property
       Conveyance and Foreclosure Laws ................................................................. 13

    b. The Non-profit Buyback Provision Neither Conflicts With HERA, Nor Frustrates its
       Goals ............................................................................................................. 15

    c. FHFA's Authority Under HERA Does Not "Fully Occupy" the Fields of Property
       Conveyance and Foreclosure Law .................................................................. 16

III. THE NON-PROFIT BUYBACK PROVISION APPLIES TO BOTH PRE- AND POST-
    FORECLOSURE SALES ....................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

*Aguayo v. U.S. Bank,*
    653 F.3d 912 (9th Cir. 2011) ..........................................................................17

*Barnett Bank of Marion County v. Nelson,*
    517 U.S. 25 (1996)................................................................................. 16-17

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005)....................................................................................12

*California v. Fed. Hous. Fin. Agency.,*
    No. 4:10-cv-03084, 2011 WL 3794942 (N.D.Cal. Aug. 26, 2011) ...................................9

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504 (1992)....................................................................................13

*City of Columbus v. Ours Garage & Wrecker Service,*
    536 U.S. 424 (2002)....................................................................................13

*City of Joliet v. New West, L.P.,*
    562 F.3d 830 (7th Cir. 2009) ...........................................................................14

*Conroy v. FDIC,*
    No. 95-11658, 1995 WL 598961 (D.Mass. 1995) ............................................11

*Cnty. of Sonoma v. Fed. Hous. Fin. Agency,*
    710 F.3d 987 (9th Cir. 2013) ......................................................................9, 10

*Cummings Properties Mgmt., Inc. v. FDIC,*
    786 F.Supp. 144 (D.Mass. 1992) ..................................................................10

*Deutsche Bank Nat'l Trust Co. v. FDIC,*
    784 F.Supp.2d 1142 (C.D.Ca. 2011) ...............................................................11

*English v. General Elec. Co.,*
    496 U.S. 72 (1990)......................................................................................15

*Fed. Hous. Fin. Agency v. City of Chicago,*
    962 F.Supp.2d 1044 (N.D.Ill. 2013) ...............................................................13

*Fed. Home Loan Mortgage Corp. v. Suero,*
    Boston Hous. Ct., No. 11H84-SP-003815 (Oct. 30, 2013)......................................5

*Fletcher v. Haas,*
    851 F.Supp.2d 287 (D.Mass. 2012) ............................................................ 18-19

*Greenwood Trust Co. v. Comm. of Mass.,*
    971 F.2d 818 (1st Cir. 1992) ...................................................................... 13

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ..................................................................................15

*Hoagland v. Town of Clear Lake*,
    415 F.3d 693 (7th Cir. 2005) ................................................................. 15

*In re JP Morgan Chase Mortgage Modification Litig.*,
    880 F.Supp.2d 220 (D.Mass. 2012) ......................................... 16, 17

*In re Landmark Land Co. of Okla., Inc.*,
    973 F.2d 283 (4th Cir. 1992) ..............................................................10, 11

*In Re Pharm. Ind. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009) ...............................................................15

*Kurns v. R.R. Friction Prods. Corp.*,
    132 S.Ct. 1261 (2012) ............................................................................17

*Lake County Estates, Inc. v. Tahoe Reg'l Planning Agency*,
    440 U.S. 391 (1979) ................................................................................17

*Leon County, Fla. v. Fed. Hous. Fin. Agency*,
    700 F.3d 1273 (11th Cir. 2012) .................................7, 8, 9, 10, 12

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ...........................................................................13, 17

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................................12

*New York v. U.S.*,
    505 U.S. 144 (1992) ............................................................................... 19

*O'Connell v. Shalala*,
    79 F.3d 170 (1st Cir. 1996) ................................................................. 19

*Orellana v. Deutsche Bank Nat'l Trust Co.*,
    No. 12–11982, 2013 WL 5348596 (D.Mass. Aug. 30, 2013)....................4

*Radatz v. Fed. Nat'l Mortgage Ass'n*,
    No. 100205, 2014 WL 2168153 (Ohio App. 8 Dist. May 22, 2014) ................10

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ........................................................................ 16-17

*Rodriguez v. U.S.*,
    480 U.S. 522 (1987) ................................................................................18

*Sierra Club, Lone Star Chapter v. FDIC*,
    992 F.2d 545 (5th Cir. 1993) ...........................................................10, 11

*Smith v. BAC Home Loans Servicing, L.P.*,
 769 F.Supp.2d 1033 (S.D.W.Va. 2011) ................................................ 12-13, 16

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
 531 U.S. 159 (2001) ................................................................................12

*Sovereign Bank v. Sturgis*,
 863 F.Supp.2d 75 (D.Mass. 2012) ..........................................................17

*Town of Babylon v. Fed. Hous. Fin. Agency*,
 699 F.3d 221 (2nd Cir. 2012)................................................................6, 9

*U.S. v. Campos-Serrano*,
 404 U.S. 293 (1971) ................................................................................19

*U.S. v. Ramirez-Ferrer*,
 82 F.3d 1131 (1st Cir. 1996) ...................................................................19

*U.S. Bank Nat'l Ass'n v. Ibanez,* Nos. 384283, 386018, 386755,
 2009 WL 795201 (Mass. Land Ct. Mar. 26, 2009)..................................20

*U.S. Bank Nat'l Ass'n v. Ibanez,*
 458 Mass. 637 (2011) ..............................................................................20

*Waterview Mgmt. Co. v. FDIC*,
 105 F.3d 696 (D.C. Cir. 1997) ................................................................16

*Watters v. Wachovia Bank, Nat'l Ass'n*,
 550 U.S. 1 (2007)...............................................................................13, 17

*Wigod v. Wells Fargo Bank, Nat'l Ass'n*,
 673 F.3d 547 (7th Cir. 2012) ..................................................................15

*Williamson v. Mazda Motor of Am., Inc.*,
 131 S.Ct. 1131 (2011)..............................................................................15

*Wisconsin Pub. Intervenor v. Mortier*,
 501 U.S. 597 (1991)...........................................................................13, 15

*Wyeth v. Levine*,
 555 U.S. 555 (2009)..................................................................................12

*Yesler Terrace Cmty. Council v. Cisneros*,
 37 F.3d 442 (9th Cir. 1994) .......................................................................9

## Statutes, Legislative History

5 U.S.C. §§ 551 *et seq.*...............................................................................8

12 U.S.C. § 4513(a)(1)(A)-(B) ....................................................................5

12 U.S.C. §§ 4561–4566 ............................................................................6

12 U.S.C. §§ 4611-13 .............................................................................6

12 U.S.C. §§ 4617(a)-(f) ................................................................. *passim*

M.G.L. c. 244, § 14 .............................................................................2, 20

M.G.L. c. 244, § 17A-B ..........................................................................20

M.G.L. c. 244, § 35B ........................................................................ *passim*

M.G.L. c. 244, § 35C ........................................................................ *passim*

An Act Preventing Unlawful and Unnecessary Foreclosures,
    2012 Mass. Legis. Serv. c. 194 ........................................2, 13, 14, 18

Financial Institutions, Reform, Recovery, and Enforcement Act of 1989,
    Pub. L. No. 101–73, 103 Stat. 183 (1989) ............................10, 11, 16

Housing and Economic Recovery Act of 2008,
    Pub. L. No. 110-289, 122 Stat. 2654 (2008) ....................... 5, *passim*

Defendants' sweeping arguments would insulate *all* of defendants' activities from the laws of any state, elevating every ordinary business transaction engaged in by Fannie Mae and Freddie Mac[1] to the realm of the sacrosanct, and outside the purview of this or any Court. Neither the "anti-injunction provision" of the Housing and Economic Recovery Act of 2008 ("HERA"), nor federal preemption doctrine abides – let alone compels – that result.

Seeking to avoid complying with Massachusetts' foreclosure and property conveyance laws, defendants assert that two guidelines created and implemented by the GSEs – not FHFA – were "actions taken by FHFA as conservator" to "preserve and conserve" the GSEs' assets – and are therefore exempt from judicial review under HERA. Yet FHFA took no action relevant to the creation or even implementation of the disputed guidelines. A single July 2012 email from FHFA that fails to mention either guideline cannot be transformed into a "directive" from FHFA acting as conservator. Moreover, even if this single informal email were an "act" by FHFA that somehow re-implemented the guidelines, the "act" was in FHFA's role as regulator, not conservator, of the GSEs, and therefore fall outside the scope of the anti-injunction provision.

Nor do general preemption principles exempt the GSEs from following Massachusetts' foreclosure and conveyance laws. Congress did not expressly provide for such preemption; no statute or regulation conflicts with the Massachusetts law at issue; and Congress certainly did not "occupy the field" of foreclosure law. Finally, defendants' argument that the disputed provision does not apply to post-foreclosure property sales is irreconcilable with the statutory text.

## STATEMENT OF UNDERLYING FACTS

**A.    The Applicable State Foreclosure and Loan Modification Law: A Balanced Response to Homeowners and Communities in Crisis**

Among the Commonwealth's responses to the 2007 housing market crash and subsequent global financial crisis was the enactment in August 2012 of comprehensive foreclosure-related legislation, which is codified in the General Laws within the chapter entitled, *Foreclosure and*

---

[1] Defendants Federal Home Loan Mortgage Corporation and Federal National Mortgage Association are referred to herein as "Freddie Mac" and "Fannie Mae," respectively, or as "GSEs" (Government Sponsored Enterprise). Defendant Federal Housing Finance Agency is referred to as FHFA.

*Redemption of Mortgages*. <u>See</u> M.G.L. c. 244, §§ 14, 35B-35C (the "Massachusetts Foreclosure Law"). This consumer protection law sets additional preconditions to the publication of a notice of foreclosure (*e.g.*, §§ 14, 35B) and prohibits certain foreclosure-related practices, such as making false statements to a court as to whether a creditor has complied with the requirements of state foreclosure law (§ 35C(d)), or imposing on a third party the cost of correcting or curing title problems (§ 35C(c)). In general, it provides greater foreclosure protections for borrowers with so-called "subprime" mortgages, and seeks to prevent some of the more abusive foreclosure practices engaged in by banks during the height of the recession.[2]

In addition to this legislative action, non-profit community groups have devised programs to stabilize vulnerable neighborhoods and address the blight and urban decay caused by the unprecedented wave of foreclosures. The Massachusetts Foreclosure Law supports these efforts with, among other things, a provision facilitating distressed property sales to such non-profits. The so-called Non-profit Buyback Provision (M.G.L. c. 244, § 35C(h)) provides as follows:

> In all circumstances in which an offer to purchase either a mortgage loan or residential property is made by an entity with a tax-exempt filing status under section 501(c)(3) of the Internal Revenue Code, or an entity controlled by an entity with such tax exempt filing status, no creditor shall require as a condition of sale or transfer to any such entity any affidavit, statement, agreement or addendum limiting ownership or occupancy of the residential property by the borrower and, if obtained, such affidavit, statement, agreement or addendum shall not provide a basis to avoid a sale or transfer nor shall it be enforceable against such acquiring entity or any real estate broker, borrower or settlement agent named in such affidavit, statement or addendum.

**B.      The Business of the GSEs and the GSEs' Servicing Guides**

Fannie Mae and Freddie Mac were created by Congressional charter to "support liquidity, stability, and affordability in the secondary mortgage market" and "facilitate the flow of mortgage credit." U.S. Government Accountability Office*, Fannie Mae and Freddie Mac: Analysis of Options for Revising the Housing Enterprises Long-term Structure, Report to Congressional Committees,* GAO-09-782, at 2 (September 2009). The GSEs purchase mortgage

---

[2]  As stated in the enabling act's first sentence, the purpose of law "is to protect forthwith the citizens of the commonwealth and prevent unnecessary foreclosures," and thus it was "declared to be an emergency law, necessary for the immediate preservation of the public convenience." <u>See</u> *An Act Preventing Unlawful and Unnecessary Foreclosures,* 2012 Mass. Legis. Serv. c. 194.

loans from private lenders, package them into mortgage-backed securities, guarantee timely payment of principal and interest on the securities to outside investors, and hold some mortgage loans and mortgage-backed securities in the GSEs' own investment portfolios.

The GSEs contract with mortgage servicers and other entities to service the mortgage loans they hold or guarantee. They also contract with third parties to manage and "dispose of" properties they own after foreclosure. The GSEs each issue lengthy and detailed mortgage servicing guides, which mortgage servicers must adhere to, and which may be altered, rescinded, waived or amended by the GSEs at any time.[3] Changes to the guidelines are issued as "Guide Bulletins" and "Industry Letters" (Freddie Mac), or "Servicing Announcements" (Fannie Mae). FHFA takes no part in drafting or amending the guides, which have existed in some form since well before FHFA's creation in 2008.

## C.     The GSEs' "Arm's Length Transaction" Servicing Requirement

Both GSEs' mortgage servicing and REO property disposition guidelines[4] preclude sales to non-profit organizations that allow qualified homeowners to stay in their homes.  First, for both pre- and post-foreclosure properties,[5] the guidelines impose an "arm's length transaction" servicing requirement, under which purchasers must attest that "there are no agreements, understandings or contracts" that the borrower will remain in the property as a tenant or "later obtain title or ownership" (the "ALT requirement").

The ALT requirement was not drafted, issued, or even announced by FHFA; instead, it was, and continues to be, implemented by the GSEs in their normal business operations. Fannie Mae's ALT requirement was issued in a 2010 Servicing Announcement signed by a Fannie Mae

---

[3] Fannie Mae's "Single Family Servicing Guide" (more than 1100 pages) can be found on the AllRegs website and in PDF at www.fanniemae.com/content/guide/svc031412.pdf (the "Fannie Guide"). Freddie Mac's equally voluminous "Single Family Seller/Servicer Guide" can also be accessed on its website and via AllRegs (www.allregs.com/tpl/Main.aspx) (the "Freddie Guide").

[4] A post-foreclosure property is often referred to as "REO" (Real-Estate Owned) because title has transferred to the creditor (*i.e.*, the lending bank) once the foreclosure is completed.

[5] A pre-foreclosure, or "short" sale occurs where the creditor agrees to a sale price that is less than the outstanding debt secured by the creditor's mortgage lien against the property.

Vice President. *See* **Exh. A** (*Introduction of Fannie Mae's Home Affordable Foreclosure Alternatives Program*, Ann. SVC-2010-07, at 3 (June 1, 2010)).[6] Later in 2010, Freddie Mac issued a Guide Bulletin, signed by a Freddie Mac officer, also adding the ALT requirement. *See* **Exh. B** (*Freddie Mac Bulletin No. 2010-16*, at 2 (July 16, 2010)).

**D.     The GSEs' "Make Whole Requirement" Concerning REO Property Sales**

The GSEs also preclude sales to non-profits through the so-called "make-whole requirement" in connection with post-foreclosure sales of their REO properties. This requirement precludes the selling agent from accepting any sum less than the full outstanding mortgage loan amount from the "former Mortgagor or relative of former Mortgagor."[7]

The origin of the make-whole requirement is not clear, but it appears to be simply a GSE-created guideline applied to sales of the GSEs' REO properties. There is no evidence to support the assertion that it was a directive or action taken by FHFA at all, much less in FHFA's role as conservator. For example, in the related *Suero* litigation – pending in this Court before Magistrate Judge Dein (Case No. 1:13-cv-13014-JGD) – Freddie Mac refused a series of fair market value offers from Boston Community Capital (BCC), a non-profit involved in community stabilization efforts, which sought to purchase and resell the foreclosed property to Ramon and Rosanna Suero, the former homeowners. The only document produced concerning the make-whole requirement – cited as the basis for refusing the offers – was a two-page, undated Freddie Mac document titled "sales procedures," which sets forth the make-whole requirement in "sales to mortgagors and their relatives" and  appears to be pulled from Freddie Mac's REO sales

---

[6] On a motion to dismiss, courts may consider certain evidence beyond the complaint, including documents whose authenticity is undisputed, official public records, and documents central to or sufficiently referred to in the complaint. *Orellana v. Deutsche Bank Nat'l Trust Co.*, No. 12–11982, 2013 WL 5348596, at *3 (D.Mass. Aug. 30, 2013). The Commonwealth anticipates defendants will not dispute the authenticity of its exhibits; moreover, they are public records and central to the Commonwealth's claim.

[7] The Commonwealth is aware of only two documents that memorialize the make-whole requirement, as referenced in this section. Both documents state that the policy applies only where the purchaser is the former mortgagor or a relative of that person, which would seem to permit sales to a non-profit entity. Nevertheless, the GSEs have cited the make-whole requirement in refusing to consider fair market value offers from non-profit Boston Community Capital (BCC) in numerous documented instances.

guidelines. *See* **Exh. C**.  And in other litigation, Freddie Mac has repeatedly described the make-whole requirement as a Freddie Mac policy.[8]

**E.      FHFA's Creation and Its Two Distinct Roles in Overseeing the GSEs**

Congress established FHFA in 2008 as an independent agency in the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654, codified at 12 U.S.C. §§ 4617 *et seq.* ("HERA"), to consolidate regulatory oversight of the GSEs and Federal Home Loan Banks. The law also enabled FHFA in certain circumstances to place the GSEs in conservatorship or receivership and take over their assets and operations. Under the statute, FHFA plays two separate and distinct roles: one as conservator and the other as regulator/supervisor of the GSEs.

This distinction is critical because HERA's "anti-injunction provision" exempts from judicial review only those actions taken by FHFA as conservator, not regulator or supervisor. *See* 12 U.S.C. § 4617(f) (precluding courts from taking "any action to restrain or affect the exercise of powers or functions of [FHFA] <u>as a conservator</u> …") (emphasis added). FHFA's "principal duties" <u>as regulator</u> include "oversee[ing] the prudential operations" of the GSEs and ensuring that the GSEs are operated in a "safe and sound manner, including maintenance of adequate capital and internal controls." *See* 12 U.S.C. § 4513(a)(1)(A)-(B). As regulator, FHFA is also directed to ensure that the GSEs' operations "foster liquid, efficient, competitive, and resilient national housing finance markets," and that "the manner in which [each GSE] is operated" is consistent with the public interest. *Id.* Also as regulator, FHFA must establish risk-based capital

---

[8]   In the eviction action that prompted the Sueros' lawsuit, Freddie Mac described the requirement as a "policy of FHLMC," citing its "policy and procedure manual," which states that "an REO sales manager must approve Sale to former Mortgagor or relative of former Mortgagor … the former Mortgagor or relative needs to make Freddie Mac whole and will need to notify Freddie Mac to confirm the make whole amount." *Mem. of Decision* (Oct. 30, 2013) (*<u>Fed. Home Loan Mortgage Corp. v. Suero,</u>* Boston Hous. Ct., No. 11H84-SP-003815, at 5 n.3 (Oct. 30, 2013)) (**Exh. D**). In another case in which a GSE is seeking to evict a BCC-qualified former homeowner, counsel for Freddie Mac reported in a May 2012 letter to the court that her firm is "required to adhere" to "Freddie Mac's … Policy/Sales Outsourcer Guide (Sales Quick Reference, Offers)," mandating the make-whole amount when the "former Mortgagor or relative of former Mortgagor" seeks to buy REO property. *See* **Exh. E**. The letter cites to the same policy manual section referred to by the court, above, in the Suero eviction action. *Id.* at n. 1.

requirements and minimum and critical capital levels, 12 U.S.C. §§ 4611-13, as well as annual GSE low-income housing goals, 12 U.S.C. §§ 4561–4566.

**F.       FHFA Assumes Conservatorship of the GSEs**

HERA enumerates the circumstances that must exist in order for the Director to place the GSEs into conservatorship or receivership. These "circumstances" are all indicia of the GSE's deteriorating or unstable financial condition. 12 U.S.C. § 4617(a)(3)(A)-(L). The statutorily-defined purpose of conservatorship or receivership is "reorganizing, rehabilitating, or winding up the affairs of a [GSE]." 12 U.S.C. § 4617(a)(2).

Only one provision of HERA defines FHFA's authority solely as conservator, as distinct from regulator. As conservator, FHFA may "take such action as may be (i) necessary to put [the GSE] in a sound and solvent condition, and (ii) appropriate to carry on the business of the [GSE] and preserve and conserve [its] assets and property[.]." 12 U.S.C. § 4617(b)(2)(D)(i)-(ii). Accordingly, in determining whether HERA's anti-injunction provision is applicable, courts have evaluated whether FHFA's actions were taken pursuant to these two statutory provisions.[9] *E.g.*, _Town of Babylon v. Fed. Hous. Fin. Agency_, 699 F.3d 221, 227 (2nd Cir. 2012).

In September 2008, FHFA placed the GSEs into conservatorship and initially took control of the GSEs. FHFA promptly re-delegated to the GSEs many of their essential functions, including (i) to the boards of directors, the authority to oversee the GSEs, and (ii) to management, the authority to conduct the GSEs' day-to-day operations. FHFA-Office of the Inspector General, *White Paper: FHFA OIG's Current Assessment of FHFA's Conservatorships of Fannie Mae and Freddie Mac,* WPR-2012-001, at 2, 12 (March 28, 2012), *available at* www.fhfaoig.gov/Content/Files/WPR-2012-001.pdf. Describing this as "the most efficient structure," FHFA has stated that the GSEs "would continue to be responsible for normal business activities and day-to-day operations" under the conservatorship; "the focus of the

---

[9] FHFA concedes that this language represents the statutory limits of its conservatorship authority, stating that "HERA specified two conservator powers" (not more), and citing the above two subparts, 12 U.S.C. § 4617(b)(2)(D)(i)-(ii). *E.g.*, FHFA, *A Strategic Plan for Enterprise Conservatorships: The Next Chapter in a Story that Needs an Ending,* Report to Congress, at 7 (Feb. 21, 2012), *available at* http://www.fhfa.gov/AboutUs.

conservatorships is not to manage every aspect of the [GSEs'] operations." FHFA, *Annual Report to Congress 2010,* at 1 (June 13, 2011), *available at* www.fhfa.gov/AboutUs.

FHFA's self-described acts as conservator have generally involved significant initiatives directed at correcting systemic flaws in the GSEs' business models.  These have included building a Common Securitization Platform (for issuing mortgage-backed securities), reducing the risk exposure associated with the GSEs' single-family mortgage credit guarantee businesses, and reducing the GSEs' retained and multifamily portfolios. FHFA, *Annual Report to Congress 2013,* at 1-5 (June 13, 2014), *available at* www.fhfa.gov/AboutUs.

## LEGAL ARGUMENT

## I.        HERA DOES NOT PROHIBIT JUDICIAL REVIEW

### a.  FHFA Took No Action In This Case

The guidelines at issue are ordinary policies established by the GSEs as part of the voluminous guidelines governing the GSEs' relationships with mortgage servicers. The disputed guidelines – which are restrictions on the disposition of distressed GSE properties either owned through foreclosure or encumbered by a GSE mortgage – are unrelated to the goals of conservatorship and bear little resemblance to FHFA's acts as conservator. Indeed, the two guidelines were not "acts" taken by FHFA at all, whether as conservator or regulator, but instead were promulgated by the GSEs in the ordinary course of operations. Responsibility for such day-to-day business activities was explicitly "re-delegated" to the GSEs at the "inception of the conservatorships," thus any such activity cannot reasonably be considered as among FHFA's unique acts as conservator. *See* FHFA *Annual Report to Congress 2010,* at 1. The guidelines' origin removes them from the sphere of FHFA's conservatorship authority, the focus of which, by FHFA's admission, is "not to manage every aspect of the [GSEs'] operations." *Id.*

Defendants avoid any discussion of the guidelines' origin and purpose. Instead, in stark contrast to the formal FHFA directives at issue in other cases that have considered the anti-injunction provision (*e.g.*, *Leon County, Fla. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1278 (11th Cir. 2012)), defendants attempt to shoehorn an after-the-fact email into an "action" taken

by FHFA as conservator. *See Defs. Mem. of Law* (Doc. No. 15-1, filed July 14, 2014) ("MTD Memo") at 4-5, Ex. A. However, the cited four-sentence email from July 2012 simply directs the GSEs to "implement … Aligned Short Sale Policies" as "part of the Servicing Alignment Initiative." *Id.* It makes no mention whatsoever of either the ALT or make-whole requirements. Indeed, the make-whole requirement applies only to REO property sales and thus is unrelated to short sale policies, while the ALT requirement was instituted by the GSEs years before the date of the email.

In sum, defendants cannot, simply by fiat, declare two guidelines created, issued, and implemented by the GSEs to be "acts" taken by FHFA as conservator of the GSEs.

**b. Any "Action" Taken by FHFA Was As Regulator, Not Conservator**

Even if the GSE guidelines were somehow "acts" of FHFA, they were acts in FHFA's role as regulator, not conservator. Courts must scrutinize "the concept and function of a conservatorship and the overall statutory scheme to determine whether the actions of the FHFA … should be deemed an act taken by the FHFA as conservator, insulated from judicial review, or an act of rulemaking within its function as a regulator." *Leon County,* 700 F.3d at 1278. "All relevant factors" pertaining to the act must be considered, including "its subject matter, its purpose, its outcome, and whether it involves a matter in which public comment might be relevant, appropriate, useful or intended by Congress." *Id.*

Analogizing to the Administrative Procedure Act context,[10] courts look for indicia of rulemaking. For example, if an action "applies across the board to an entire category of cases," it is akin to rulemaking. *Leon County,* 700 F.3d at 1278. Conversely, a "non-rule" action "looks more like a discreet management decision by a conservator" and typically has "a very narrow field of operation." *Id.* A directive or other action that establishes "a general set of criteria to be applied across the board by Fannie Mae and Freddie Mac to their mortgage transactions in

---

[10] The Administrative Procedure Act of 1946 (the "APA") creates a framework for regulating federal agencies like FHFA and governs the way in which such agencies may establish regulations (including requiring a public comment period), as well as providing for judicial review thereof. Pub. L. No. 79–404, 60 Stat. 237, codified presently at 5 U.S.C. §§ 551 *et seq.*

general" is one that "would have the mark of a regulation." *Id*. *See also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (breadth and prospective nature of an agency's action are hallmarks of an administrative rule).

1.      **Courts Have Recognized the Limits of FHFA's Conservator Authority**

In the so-called PACE program cases, state authorities challenged an FHFA directive that prompted the GSEs to stop buying mortgage loans secured by homes encumbered with so-called PACE (Property-Assessed Clean Energy) loans.[11] *Cnty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987 (9th Cir. 2013); *Leon County*, 700 F.3d 1273; *Town of Babylon*, 699 F.3d at 227. The PACE loans were secured by liens that were granted priority over all other encumbrances, including pre-existing mortgage liens.

FHFA issued five formal statements and letters regarding the specific threats to the GSEs' safety and soundness posed by the PACE programs. These included an FHFA statement severely restricting the GSEs' mortgage purchasing conduct in areas with PACE programs, and a letter in which FHFA explicitly invoked its authority as conservator in directing that the GSEs refrain from purchasing mortgages loans on PACE-encumbered properties. *See California v. Fed. Hous. Fin. Agency*, No. 4:10-cv-03084, 2011 WL 3794942, at *2 (N.D.Cal. Aug. 26, 2011), *vacated and dismissed by Cnty. of Sonoma*, 710 F.3d 987. These statements were the first pronouncements concerning a program in its infancy and concerning which the GSEs had no pre-existing policies or guidelines. And unease over the rapidly-proliferating PACE programs – and the potential diminution in value of pre-existing mortgage loans that could result from granting "after the fact" first-priority lien status to PACE loans – was defensible as a subject of concern for FHFA in its role as conservator.

While courts concluded that HERA's anti-injunction provision divested them of jurisdiction over the PACE cases, they also emphasized the limits of FHFA's "conservator" role:

---

[11] First introduced in 2009, PACE programs are funded by the U.S. Department of Energy and operated by local governments; they provide financing for home "retrofits" to improve energy efficiency. *Town of Babylon*, 699 F.3d at 225. A government entity pays the cost of the retrofit and imposes this cost as an assessment (lien) on the property. *Leon County*, 700 F.3d at 1276.

The FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp. Congress did not intend that the nature of the FHFA's actions would be determined based upon the FHFA's self-declarations because the distinction between regulator and conservator would be one without a meaning or effect. Moreover, "if the FHFA were to act beyond statutory or constitutional bounds in a manner that adversely impacted the rights of others, § 4617(f) would not bar judicial oversight or review of its actions." *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F.Supp.2d 790, 799 (E.D.Va.2009) (citation omitted), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency*, 434 Fed.Appx. 188 (4th Cir.2011) (per curiam).

*Leon County,* 700 F.3d at 1278; *accord Radatz v. Fed. Nat'l Mortgage Ass'n*, No. 100205, 2014 WL 2168153 (Ohio App. 8 Dist. May 22, 2014). The Ninth Circuit similarly recognized that "FHFA cannot evade judicial review and the APA's requirements for rulemaking simply by invoking its authority as conservator." *Cnty of Sonoma*, 710 F.3d at 994. Rather, "analysis of any challenged action is necessary to determine whether the action falls within the broad, but not infinite, conservator authority." *Id.*; *see also Cummings Prop. Mgmt., Inc. v. FDIC*, 786 F.Supp. 144, 145-46 (D.Mass. 1992) (anti-injunction provision governing FDIC receiverships "does not elevate the FDIC to the position of a sacred cow which may graze upon the rights of others at will, unchecked by the courts").

Cases considering a similar anti-injunction provision governing the FDIC likewise highlight the need to closely scrutinize attempts by FHFA "to label its actions with a conservator stamp." *See generally* Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101–73, 103 Stat. 183 (1989) (authorizing FDIC receiverships in wake of savings and loan crisis of mid-1980s). In those cases, the FDIC was acting as receiver, not conservator, to wind-down failed banks while maximizing any return on assets. *See In re Landmark Land Co. of Okla., Inc.*, 973 F.2d 283, 289-90 (4th Cir.1992). Because FDIC's receivership in each instance was of finite duration and for the discrete purpose of liquidation – and because judicial interference "could seriously hamper" FDIC's efforts – Congress saw fit to broadly shield FDIC's acts as receiver from judicial review. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 550 (5th Cir. 1993). However, an important counterweight to this freedom from oversight was the establishment by FIRREA of an extensive claims review process as part

of any FDIC receivership.[12] *In re Landmark Land Co.*, 973 F.2d at 288. By this process, aggrieved parties are provided with some form of remedy under a receivership despite a lack of access to the courts.

By contrast, no such protections exist under conservatorship; when FHFA acts as conservator, there is no "safeguard to individual rights against arbitrary government action." *Sierra Club*, 992 F.2d at 550 (describing FDIC's actions in its corporate capacity). Unlike FDIC's receivership role under FIRREA, FHFA's conservatorship of the GSEs has not been for a limited period of time, nor does it have a discrete goal, such as liquidating the GSEs.[13] Moreover, under the conservatorship, an aggrieved party has no means for seeking redress. The FIRREA cases are thus distinguishable and should prompt even closer review of FHFA's attempts to wield its conservatorship authority. As the Fifth Circuit found in holding that the the anti-injunction provision did not shield the FDIC when acting in its corporate capacity:

> We simply cannot assume that a grant of rights and powers to the FDIC, without any reference to the court's power over the FDIC's exercise of those rights and powers, includes a limitation on anything so fundamentally embedded in our system of jurisprudence as the court's equity jurisdiction.

*Sierra Club*, 992 F.2d at 550. *See also Conroy v. FDIC*, No. 95-11658, 1995 WL 598961, at *4 (D.Mass. 1995) (holding same); *Deutsche Bank Nat'l Trust Co. v. FDIC*, 784 F.Supp.2d 1142, 1156-58 (C.D.Ca. 2011) (violating state contract law, which is not preempted by FIRREA, FDIC "asserted authority beyond" its receiver role; anti-injunction provision thus did not preclude court review).

### c. The GSE Guidelines Do Not Fall Within FHFA's Limited Conservator Authority

Insofar the GSEs' establishment and implementation of the ALT and make-whole requirements were "acts" of FHFA at all, these acts would fall outside FHFA's *conservator*

---

[12] HERA likewise allows FHFA to place the GSEs in receivership and establishes a detailed claims review process under any such receivership. *See*, 12 USC §§ 4617(a); (a)(4); (b)(2)(E)-(F); (b)(2)(K)(i).

[13] According to FHFA, a central "purpose" of the conservatorships was to "restore the [GSEs] to a sound financial condition …" FHFA, *Annual Report to Congress 2011*, at 1 (June 13, 2012) *available at* www.fhfa.gov/AboutUs. Since early 2012, the GSEs have posted nine straight quarterly profits and have required no further government funding.

authority, because they bear all the hallmarks of rules. Namely, they are policies that form part of standard guidelines applying "across the board" to all mortgage and REO property transactions (rather than having a "very narrow field of operation," *Leon County*, 700 F.3d at 1278). And as described above in Section I.a., defendants have failed to identify any "discrete management decision" made by FHFA akin to the formal announcements at issue in the PACE cases.

Moreover, FHFA's descriptions of its acts as conservator have never included conducting the GSEs' daily operations, which FHFA specifically re-delegated to the GSEs. *FHFA Annual Report to Congress 2010,* at 1. Defendants cannot now retrospectively characterize GSE-established guidelines as FHFA's own acts as conservator. Any GSE business decision or act designed to improve operations, no matter how minor, is arguably done to increase profit margins and thus to "preserve and conserve" assets. To sweep every such act under the rubric of FHFA's conservatorship authority, as defendants' argue, is to obliterate the statutorily-mandated distinction between FHFA's roles as regulator versus conservator, thus eliminating judicial review over FHFA's actions as regulator. Such was clearly not Congress's intent in enacting the limited anti-injunction provision. *See Leon County,* 700 F.3d at 1278.

## II.     THE NON-PROFIT BUYBACK PROVISION IS A FORECLOSURE AND PROPERTY CONVEYANCE LAW WITHIN THE STATE'S POLICE POWERS AND IS NOT PREEMPTED BY HERA

"[B]ecause the states are independent sovereigns in our federal system," the Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). This presumption has special force in cases involving the traditional exercise of police powers by local governments. *See Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). Courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. at 565 (2009) (quotation omitted). Included among states' "historic police powers" are state consumer protection statutes (*e.g., Smith v. BAC Home Loans Servicing, LP*, 769 F.Supp.2d 1033, 1038 (S.D.W.Va. 2011)

(citations omitted)), state usury and contract laws, and state laws governing "the acquisition and transfer of property." _Watters v. Wachovia Bank, Nat'l Ass'n_, 550 U.S. 1, 11 (2007). This presumption against preemption is "stronger still" where, as here, the state statute provides a remedy and no federal remedy exists. _Smith_, 769 F.Supp.2d at 1038 (citation omitted).

In general, "courts must tread cautiously in this arena because the authority to displace a sovereign state's law is "an extraordinary power.... that we must assume Congress does not exercise lightly." _Greenwood Trust Co. v. Comm. of Mass._, 971 F.2d 818, 823 (1st Cir. 1992) (citation omitted).

The Massachusetts Foreclosure Law is a law directly aimed at providing greater consumer protections in the process of foreclosure. Its Non-profit Buyback Provision, in particular, concerns the law of property conveyance. Both of these legal spheres have long been considered within the province of the state's police powers. Defendants' various preemption arguments are unavailing and fail to overcome the strong presumption against preemption here.

### a. HERA's Express Language Does Not Preclude a State's Enforcement of its Property Conveyance and Foreclosure Laws

No provision in HERA expressly preempts state foreclosure law, let alone expressly preempting state law regulating property conveyance, such as the Non-profit Buyback Provision.

"Express" preemption exists where the express language in a congressional enactment (whether statutory or regulatory) precludes state action in a specified area. _Lorillard Tobacco Co. v. Reilly_, 533 U.S. 525, 541 (2001) (citing _Cipollone v. Liggett Group, Inc._, 505 U.S. 504, 517 (1992)). However, express preemption "requires Congress to declare its intention to preempt state or local regulations 'through a direct statement in the text of federal law.'" _Fed. Hous. Fin. Agency v. City of Chicago_, 962 F.Supp.2d 1044, 1056 (N.D.Ill. 2013) (citation omitted). The absence of such language is dispositive, because "mere silence cannot suffice to establish a clear and manifest purpose to pre-empt local authority." _Wisconsin Pub. Intervenor v. Mortier_, 501 U.S. 597, 604 (1991). Absent a "clear and manifest purpose to the contrary," federal courts should "resist attribution to Congress of a design to disturb state and local statutes." _City of Columbus v. Ours Garage & Wrecker Serv._, 536 U.S. 424, 439 (2002).

In the absence of any "direct statement" preempting state laws like the Non-profit Buyback Provision, defendants cite language in HERA that bars other agencies from directing FHFA in its role as conservator: when acting as conservator, FHFA "shall not be subject to the direction or supervision of any other agency of the U.S. or any state in the exercise of [its] rights, powers, and privileges." 12 U.S.C. § 4617(a)(7). But this language does not convey a "clear and manifest purpose" to preempt laws in the historically state-regulated fields of foreclosure and property conveyance. Instead, it refers to attempts by other federal agencies or state authorities to become FHFA's regulator or supervisor while FHFA as conservator acts to "carry on the business of the GSEs" and "preserve and conserve" the GSEs' assets. 12 U.S.C. § 4617(b)(2)(D)(ii). The Non-profit Buyback Provision does not "direct" FHFA in any manner with respect to its role as the GSEs' conservator.

To begin with, the Massachusetts Foreclosure Law is far removed from mortgage lending and the GSEs' core business of purchasing, securitizing and guaranteeing mortgage loans; instead, it governs the process of foreclosure, an area of law historically delegated to state authority. And the Non-profit Buyback Provision simply prohibits a restriction on the alienation of property; it does not "direct" the GSEs to do anything. This provision does not require the GSEs (or anyone else) to sell a property to any particular buyer or at any particular price. It merely precludes creditors from refusing to sell based solely on the buyer's intention to convey the property to the former mortgagor.

An instructive case on this point is _City of Joliet v. New West L.P._, 562 F.3d 830 (7th Cir. 2009), where the U.S. Department of Housing and Urban Development (HUD) contended that the broad "national goals" of the Fair Housing Act (which include preserving the stock of low-income housing) preempted the city's eminent domain authority to take ownership of buildings secured by HUD mortgages. There, as here, no express statement in the Act forbade local authorities from exercising this traditional state power. The city prevailed because "general statements of national policy do not preempt concrete laws." _Id_. at 836 ("only a clear statement in a national statute can supersede a governmental body's own operations") (citation omitted);

*Gregory v. Ashcroft*, 501 U.S. 452 (1991). *See also Hoagland v. Town of Clear Lake*, 415 F.3d 693 (7th Cir. 2005) (local zoning laws as to airport sites not preempted by Federal Aviation Act).

Defendants' argument thus fails because the state laws at issue here do not run afoul of HERA's limited express preemption clause, and "mere silence cannot suffice to establish a clear and manifest purpose to pre-empt local authority." *Wisconsin*, 501 U.S. at 604.

### b. The Non-profit Buyback Provision Neither Conflicts With HERA, Nor Frustrates its Goals

In the absence of express language, preemption may be implied where Congress enacts a law "such that compliance with both federal law and the state statute at issue is a physical impossibility, in which case the state statute must yield." *In Re Pharm. Ind. Average Wholesale Price Litig.*, 582 F.3d 156, 174 (1st Cir. 2009) (citation omitted). So-called "conflict preemption" exists where a state law actually conflicts with federal law or "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) (citation omitted); *cf. Williamson v. Mazda Motor of Am., Inc.*, 131 S.Ct. 1131, 1136 (2011) (so-called "obstacle" conflict preemption frustration of a *significant* objective of federal law). However, while conflict preemption applies equally to both federal regulations and federal statutes (*Wigod v. Wells Fargo Bank, Nat'l Ass'n*, 673 F.3d 547, 577 n. 15 (7th Cir.2012)), it does not apply to mere business practices such as the guidelines at issue here.

Here, the only conflict that may exist is between the Non-profit Buyback Provision, on the one hand, and the ALT and make-whole requirements, on the other. It is presumably impossible to simultaneously comply with both the Massachusetts law and the GSEs' guidelines where a competitive offer to purchase a GSE property has been extended by a non-profit entity that intends to sell the property to the former mortgagor. *See Wigod*, 673 F.3d at 577-78. But because the guidelines are neither laws nor regulations, they do not have the force of law and thus cannot preempt any conflicting state statute.

Defendants claim the Non-profit Buyback Provision instead conflicts with HERA's grant of authority to FHFA as conservator or receiver to "transfer or sell any asset … without any

approval, assignment, or consent" from another party." *MTD Memo* at 16-17 (citing 12 U.S.C. §

4617(b)(2)(G)). However, it is not "impossible" to comply with both the Non-profit Buyback

Provision and FHFA's authority to freely sell GSE assets. By prohibiting a particular condition

of sale, the Non-profit Buyback Provision does not interpose a requirement of state "approval" or

"consent," nor does it mandate any particular property sale. The effect of this subsection is that

where an offer is made at a price the GSE would accept from any other buyer, if all other

conditions are equal, the GSE may not refuse this sale based solely on the buyer's intent to sell

the property to the former mortgagor.[14] *See* <u>Waterview Mgmt. Co. v. FDIC</u>, 105 F.3d 696, 699-

700 (D.C.Cir. 1997) (recognizing exclusive purchase option in pre-receivership contract did not

conflict with analog FIRREA provision granting FDIC free rein as receiver to sell bank's assets,

nor did it violate FIRREA by subjecting FDIC to "direction or supervision" of state).

Thus, the Non-profit Buyback Provision neither creates an "impossibility" (of complying

with both state and federal law), nor does it "stand as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress." <u>Smith</u>, 769 F.Supp.2d at 1039

(citations omitted).

### c. FHFA's Authority Under HERA Does Not "Fully Occupy" the Fields of Property Conveyance and Foreclosure Law

In the absence of either express or conflict preemption, defendants are left to argue the

"narrow category" of field preemption. <u>Smith</u>, 769 F.Supp.2d at 1039; <u>In re JP Morgan Chase</u>

<u>Mortgage Modification Litig.</u>, 880 F.Supp.2d 220, 236 n. 30 (D.Mass. 2012) ("field preemption

doctrine operates within carefully defined constraints"). Defendants must show that HERA

created a "scheme of federal regulation so pervasive as to make reasonable the inference that

Congress left no room for the States to supplement it." <u>Barnett Bank of Marion County v.</u>

<u>Nelson</u>, 517 U.S. 25, 31 (1996) (quoting <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230

---

[14] Moreover, far from damaging FHFA's efforts in "preserving and conserving" GSE assets, the Non-profit Buyback Provision instead supports this goal by facilitating property sales at fair market value. Without supporting evidence, defendants cite "concerns" that borrowers will strategically default and/or avoid a loan modification in order to reacquire the property "at a larger discount." *MTD Memo* at 5, 9. However, if a GSE has evidence that a borrower or borrower's agent has engaged in fraud, this is a different and valid basis to reject the sale and does not violate the Non-profit Buyback Provision.

(1947)). A state law may be set aside only where "preemptive intent" can be implied from "the depth and breadth of a congressional scheme that occupies the legislative field." *Lorillard*, 533 U.S. at 541 (citation omitted); *accord Kurns v. R.R. Friction Prods. Corp.*, 132 S.Ct. 1261, 1266 (2012).

Nothing in HERA suggests Congress intended for the law to "exclusively occupy" the traditional state domains of foreclosure and property conveyance law. *See Lake County Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 402 (1979) (regulation of land use traditionally a function performed by local governments); *Sovereign Bank v. Sturgis*, 863 F.Supp.2d 75, 101 (D.Mass. 2012) (noting that no uniform federal scheme of foreclosure regulation exists and that "without state foreclosure law, there would be no foreclosure law whatsoever"); *see also Aguayo v. U.S. Bank*, 653 F.3d 912, 923 (9th Cir. 2011) ("right to repossess property that is the subject of a secured transaction has deep roots in common law and remains a fixture of state, not federal, law").

In the highly analogous context of the National Bank Act (NBA) and state laws affecting mortgage lending activities, the Supreme Court has held that national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters*, 550 U.S. at 11-12 (NBA preempts only those state laws that "prevent or significantly interfere with" exercise of national bank's powers). The *Watters* court went on to note that among the state law realms not preempted by the NBA are the "acquisition and transfer of property." *Id*. (citation omitted); *see also In re JP Morgan Chase*, 880 F.Supp.2d at 236 (recognizing that NBA does not ordinarily preempt state consumer protection laws); *Sovereign Bank*, 863 F.Supp.2d at 102 (since foreclosure "is a part of the traditional infrastructure of basic state laws that undergird commercial transactions," foreclosure laws not preempted by the federal Home Owner's Loan Act). Instead, HERA is concerned with the GSEs' financial stabilization and with regulation of their core business, which involves purchasing and securitizing mortgage loans in order to create liquidity in the secondary mortgage market.

FHFA itself recognizes that the GSEs are subject to local laws affecting property and land use. For example, the GSEs' servicing guides are peppered with instructions concerning compliance with state and local law in numerous areas, including upkeep and disposition of property, the process and timing of foreclosures, and prosecuting evictions. In addition, GSE servicers are directed "to be aware of, and in full compliance with" all state and local laws that apply to any of its origination, selling, or servicing practices or other business practices that may have a material effect on" the GSE. *Fannie Guide* (Part I, Ch. 3, §307) at pp. 103-19, -20; <u>*see also*</u> *Freddie Guide,* Vol. 1 at ch. 6.2 (same).

Nor does HERA's bar on attempts to "regulate or supervise" the GSEs and activities impairing FHFA's mandate to "preserve and conserve" GSE assets, including the authority to freely sell GSE assets, "occupy the field" so as to preclude a state foreclosure law like the one at issue here. As noted above, the Non-profit Buyback Provision is part of a broader law that governs the process and procedure of foreclosure and prohibits a particular restraint on the alienation of property. In addition to falling squarely within the province of state authority, laws concerning foreclosure and property conveyance have nothing to do with the purchase and securitization of mortgage loans – the core business of the GSEs and, by extension, FHFA's focus as conservator.

Defendants' untenable interpretation of the FHFA's "preserve and conserve" mandate as preempting laws as attenuated from HERA as the Massachusetts Foreclosure Law implies preemption of vast swaths of state law. Any and every trivial act of either GSE in conducting its business is arguably done to enhance profit, and thus to "preserve or conserve" assets, and innumerable state laws may constrain the GSEs in carrying out their business. The concept of "field preemption" does not mean that any state law or regulation that may tangentially brush up against a GSE business activity is preempted. <u>*Rodriguez v. U.S.*</u>, 480 U.S. 522, 525-26 (1987) ("no legislation pursues its purposes at all costs;" preemption does not mean that "*whatever* furthers the statute's primary objective must be the law"). Nor is "every state enactment which in any way deals with" an area of federal law preempted. <u>*Fletcher v. Haas*</u>, 851 F.Supp.2d 287, 304

(D.Mass. 2012) (citizenship requirement of state firearm law not preempted by exclusive federal right to regulate immigration). Ignoring these basic tenets, defendants' approach would eviscerate the Constitutionally-guaranteed reservation to states of legal authority in areas not occupied by federal law. _New York v. U.S._, 505 U.S. 144, 187 (1992) (the Tenth Amendment "leaves to the several States a residuary and inviolable sovereignty").

## III.    THE NON-PROFIT BUYBACK PROVISION APPLIES TO BOTH PRE- AND POST-FORECLOSURE SALES

Defendants argue that the Non-profit Buyback Provision applies only in the pre-foreclosure, "short sale" context. This view is irreconcilable with the language of both the provision itself and the entire statute, which make clear that the provision applies to both pre- and post-foreclosure sales. _O'Connell v. Shalala_, 79 F.3d 170, 176 (1st Cir. 1996) (court must examine statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language.").

The provision applies to "an offer to purchase either a mortgage loan or residential property" and prohibits any "creditor" from attaching certain conditions to any such sale. M.G.L. c. 244, § 35C(h). A "creditor" is defined as "a person or entity that holds or controls, partially, wholly, indirectly, directly or in a nominee capacity, a mortgage loan securing a residential property." M.G.L. c. 244, § 35C(a). This definition specifies those to whom the law applies; it does not purport to restrict the law's application to pre-foreclosure activities. Indeed, certain of the law's provisions concern post-foreclosure conduct.[15] The definition urged by the defendants would render these provisions meaningless, contravening basic tenets of statutory interpretation. _See_ _U.S. v. Campos-Serrano_, 404 U.S. 293, 301 n. 14 (1971) (no clause, sentence or word should be rendered "superfluous, void or insignificant"); _U.S. v. Ramirez-Ferrer_, 82 F.3d 1131, 1137-1138 (1st Cir.1996) (interpretation cannot "derogate from the force of" a law's other provisions).

---

[15] For example, creditors are prohibited from (i) imposing the cost on third parties of curing an improperly-conducted foreclosure, and (ii) making false statements in court relating to their compliance with foreclosure laws (§§ 35C(c)-(d)). Creditors must also comply with the law's reporting requirements, which continue even after a foreclosure auction (§ 35B(g)).

Moreover, a creditor remains a "creditor" under the statute even after foreclosure. A foreclosure sale does not extinguish the mortgage loan itself (the note), only the associated lien on the property. *See* <u>*U.S. Bank Nat'l Ass'n v. Ibanez,*</u> Nos. 384283, 386018, 386755, 2009 WL 795201, at *2 (Mass. Land Ct. Mar. 26, 2009), *aff'd sub nom.* <u>*U.S. Bank Nat'l Ass'n v. Ibanez*</u>, 458 Mass. 637 (2011) (purpose of foreclosure notice publication is to secure highest price for property, as mortgagor "may face personal liability for the full amount of any deficiency"). Indeed, the GSEs and other creditors may pursue any deficiency balance on the note even after the creditor assumes ownership of the residential property following foreclosure. *See* M.G.L. c. 244, §§ 14, 17A-B. Thus, following foreclosure, the creditor simply becomes an unsecured "creditor" as to the deficiency balance due on the mortgage note—and remains bound by the Non-profit Buyback Provision with respect to any REO sale.

WHEREFORE, the Commonwealth of Massachusetts requests that the Court set a date for oral argument concerning defendants' *Motion to Dismiss* at its earliest possible convenience and, following such argument, deny the defendants' *Motion to Dismiss*.

Respectfully submitted,
COMMONWEALTH OF MASSACHUSETTS
MARTHA COAKLEY, ATTORNEY GENERAL

Date:  August 11, 2014

By:_____/s/ M. Claire Masinton_____
M. Claire Masinton, BBO #646718
Stephanie Kahn, BBO #547477
Lisa R. Dyen, BBO #676264
Assistant Attorneys General
Public Protection & Advocacy Bureau
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Claire.Masinton@state.ma.us; (617) 963-2454

## Certificate of Service

I, M. Claire Masinton, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  Paper copies will be sent to those indicated as non-registered participants on **August 11, 2014**.

_____/s/ M. Claire Masinton_____
M. Claire Masinton, BBO #646718