UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-12878-RGS

COMMONWEALTH OF MASSACHUSETTS

v.

FEDERAL HOUSING FINANCE AGENCY,
FEDERAL HOME LOAN MORTGAGE CORPORATION, and
FEDERAL NATIONAL MORTGAGE ASSOCIATION

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS

October 21, 2014

STEARNS, D.J.

In this litigation, conflicting responses by the Federal government and the Commonwealth of Massachusetts to the housing market crisis of 2007-2008 vie for supremacy. Plaintiff Commonwealth of Massachusetts, by its Attorney General, Martha Coakley, alleges that the "Arms-Length Transaction" and "Make-Whole" restrictions imposed on the sale of pre- and post-foreclosure homes by defendants Federal Home Loan Mortgage Corporation (Freddie Mac) and Federal National Mortgage Association (Fannie Mae) violate the Non-profit Buyback Provision of the Massachusetts Foreclosure Law, Mass. Gen. Laws ch. 244, § 35C(h). The Commonwealth also names as defendant the Federal Housing Finance

Agency (FHFA) in its capacity as conservator for Freddie Mac and Fannie Mae. Defendants contend that the Supremacy Clause of the U.S. Constitution bars this lawsuit.

BACKGROUND

After the collapse of the housing market and the global financial crisis of 2007-2008, and the wave of foreclosure actions that followed, in 2012, the Massachusetts Legislature passed "An Act Preventing Unlawful and Unnecessary Foreclosures." *See* Mass. Gen. Laws ch. 244, §§ 14, 35B-35C (the Foreclosure Law). The Foreclosure Law extends a layer of consumer protection to homeowners saddled with the riskiest subprime mortgages and seeks to curb abusive foreclosure practices on the part of some mortgage purchasers. Among its provisions, the Foreclosure Law requires a mortgagee-creditor to extend a loan modification offer to a borrower in circumstances where a restructuring of the mortgage would result in an affordable payment for the borrower and would incur less expense to the creditor than the anticipated costs of foreclosure. *See id.* § 35B. The Foreclosure Law also imposes stringent notice requirements, prohibits the initiation of a foreclosure by a party without the actual authority to do so, forbids a creditor from shifting the costs of correcting title defects to third-parties or imposing non-foreclosure related fees on borrowers, and

punishes a creditor for making false statements in a court of law about its compliance with these requirements or about the borrower's payment history.  *See id.* §§ 14 & 35C.

A beneficiary of the Foreclosure Law is a Massachusetts non-profit entity, Boston Community Capital (BCC), which in 2009 undertook a Stabilizing Urban Neighborhoods (SUN) Initiative with the goal of remediating inner-city neighborhoods plagued by "underwater" mortgages and abandoned homes.  The SUN formula involves the purchase of troubled mortgages or post-foreclosure homes (also known as Real Estate Owned (REO) homes) at their current fair market value and the resale or renting of the properties to the former homeowners at their reassessed (lower) value, in instances where the prior owner is able to afford the new monthly payment.  Since 2009, the BCC claims to have kept 475 Massachusetts families in homes that they would otherwise have lost to foreclosure.

The Foreclosure Law's "Non-Profit Buyback Provision" is tailored to support programs like the SUN Initiative by barring mortgage creditors from setting restrictive conditions on the sale of residential properties to non-profit organizations like BCC that give preferences to existing homeowners.  The Non-Profit Buyback Provision reads as follows.

> In all circumstances in which an offer to purchase either a mortgage loan or residential property is made by an entity with

> a tax-exempt filing status under section 501(c)(3) of the Internal Revenue Code, or an entity controlled by an entity with such tax exempt filing status, no creditor shall require as a condition of sale or transfer to any such entity any affidavit, statement, agreement or addendum limiting ownership or occupancy of the residential property by the borrower and, if obtained, such affidavit, statement, agreement or addendum shall not provide a basis to avoid a sale or transfer nor shall it be enforceable against such acquiring entity or any real estate broker, borrower or settlement agent named in such affidavit, statement or addendum.

*Id.* § 35C(h).

Defendants Freddie Mac and Fannie Mae are two federally chartered private corporations of the type commonly referred to as government-sponsored enterprises (GSEs). GSEs Freddie Mac and Fannie Mae own or guarantee roughly half of the outstanding residential mortgage loans in the United States. Defendant FHFA is a federal agency created by the Housing and Economic Recovery Act of 2008 (HERA), 12 U.S.C. § 4617 *et seq.* FHFA oversees and regulates the two GSEs and the twelve U.S. government sponsored Federal Home Loan Banks. Since September of 2008, as a result of the collapse of the housing market, the FHFA has (under the authority of HERA) held Fannie Mae and Freddie in conservatorship.[1]

---

[1] Under 12 U.S.C. § 4617(a)(3)(A)-(L), FHFA may place these and related GSEs under conservatorship or receivership when circumstances indicate that the GSEs are in deteriorating or unstable financial condition. The purpose of the conservatorship is to "reorganize[e], rehabilitat[e], or wind[] up the affairs of" the GSEs. *Id.* § 4617(a)(2).

The two GSEs issue Servicing Guides to banks and other entities with whom they contract to service the mortgages under guarantee and to manage any foreclosed properties. In 2010, the GSEs imposed an Arms-Length Transaction (ALT) restriction on both pre-foreclosure and REO sales – a prospective buyer must attest that there are no agreements, understandings, or contracts guaranteeing that the original borrower will remain in the home as a tenant or will later have a right of first-refusal when the property is put up for sale. With respect to REO sales, the Servicing Guides preclude a selling agent from accepting any sum less than the full outstanding mortgage loan amount from the former mortgage holder or a person acting as a proxy for the former homeowner (the Make-Whole restriction).

The Complaint, the allegations of which the court for present purposes accepts as true, describes several instances in which the GSEs have declined offers from BCC to purchase homes in foreclosure at their market-value, citing to the ALT and/or the Make-Whole restriction. Compl. ¶¶ 23-26. The Complaint seeks a declaration that such refusals violate the Non-Profit Buyback Provision of the Foreclosure Law (Counts I & II). The Complaint also alleges that the GSEs' refusal to sell to BCC (and similar non-profit entities) based on the ALT and Make-Whole restrictions

is an unfair or deceptive business practice that violates the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count III). In addition to monetary penalties, the Commonwealth asks the court to enjoin the GSEs from enforcing the ALT and the Make-Whole restrictions in Massachusetts. On July 14, 2014, defendants collectively moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) & (6). The court heard argument on October 9, 2014.

## DISCUSSION

Defendants' principal contention is that HERA bars the court from granting the declaratory and injunctive relief the Commonwealth seeks. HERA expressly prohibits any "court [from] tak[ing] any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator . . . ." 12 U.S.C. § 4617(f) (the Anti-Injunction Clause). As conservator, FHFA may "take such actions as may be (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D).

Defendants maintain that FHFA, in directing the GSEs to implement and enforce the ALT and the Make-Whole restrictions, acted within the scope of its powers and duty as conservator to "preserve and conserve" the

GSEs' assets. They analogize this to the directive issued by the FHFA to Freddie Mac and Fannie Mae to "protect themselves against . . . risks [] raised by PACE [(Property Assessed Clean Energy)] programs that impose priority or first-liens on participating properties." *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 225-226 (2d Cir. 2012).

> PACE programs are operated by local governments. They encourage property owners to make home improvements that reduce energy consumption, promote clean energy, create local jobs, and reduce greenhouse gas emissions, thereby mitigating the effect of global climate change. The local governments offer financing to commercial and residential property owners to fund the cost of the property improvements. Typically, the owners repay the particular local government, which calls the financing advances "assessments," on a scheduled periodic basis. If a scheduled payment is not made, in many PACE programs, the delinquent amount attaches to the real property as a "tax lien." Such a lien has priority over any other lien attached to the property, including new and preexisting mortgage liens, and stays with the property in the event of sale.

*Id.* at 225.

In response to the FHFA directive, Freddie Mac and Fannie Mae issued policy statements declaring that "they would no longer purchase mortgages secured by properties subject to first-lien PACE obligations." *Id.* at 226. The Town of Babylon and the Natural Resources Defense Council challenged the decision in a lawsuit. The Second Circuit affirmed the district court's determination that the Anti-Injunction Clause of § 4617 precluded judicial review. The Second Circuit explicitly held that in issuing

7

the directive, the FHFA was acting within the scope of its power and function as the GSEs' conservator.

> The FHFA Directive to Fannie Mae and Freddie Mac related concerns that PACE priority liens enhanced the risks associated with subordinated mortgages and directed the entities to protect themselves against such risks. As a conservator, FHFA was expressly empowered to take "such action as may be – (i) necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition; and (ii) appropriate to . . . preserve . . . [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). Directing protective measures against perceived risks is squarely within FHFA's powers as a conservator.

*Id.* at 227. The Ninth and Eleventh Circuits, in reviewing the same PACE program issue, reached the same conclusion. *See Leon Cnty., Fla. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1279 (11th Cir. 2012) ("It is fully within the responsibilities of a protective conservator, acting as a prudent business manager, to decline to purchase a mortgage when its lien will be relegated to an inferior position for repayment."); *Cnty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 993 (9th Cir. 2013) (reversing the one district court to rule to the contrary) ("A decision not to buy assets that FHFA deems risky is within its conservator power to 'carry on' the Enterprises' business and to 'preserve and conserve the assets and property of the [Enterprises].'"). Defendants contend that the ALT and Make-Whole restrictions are indistinguishable from the restriction at issue in the PACE cases.

At the outset, the Commonwealth questions whether FHFA "acted" at all in issuing the ALT and Make-Whole restrictions. In the instance of the PACE programs, the FHFA issued multiple public statements, including one in July of 2010 specifically addressing concerns with the risks in giving priority to PACE program liens and directing the GSEs "to review their collateral policies in order to assure that pledged collateral is not adversely affected by energy retrofit programs that include first liens." *Town of Babylon*, 699 F.3d at 226, *quoting* Fed. Hous. Fin. Agency, *Statement on Certain Energy Retrofit Loan Programs 2* (2010). In the ALT and Make-Whole instances, by contrast, the Commonwealth contends that the FHFA took no binding action because it never issued a formal statement assessing the risks, or required the GSEs, in so many words, to impose the restrictions.

Defendants aptly point out that the Commonwealth's Complaint says something quite different in paragraph 19: "Defendant FHFA *has issued* the so-called "make-whole" directive." (emphasis added). Defendants also cite a July of 2012 email from the FHFA's General Counsel to the GSEs as the pertinent "directive." Defs' Mem. at 4 & Ex. A. In relevant respects, the email states:

> As part of the Servicing Alignment Initiative, FHFA directed the Enterprises to develop consistent requirements for servicing

> non-performing loans. Those discussions have resulted in an aligned set of policies for short sales, summarized in the attached guidances, policies and related information. On behalf of FHFA, acting as conservator, the Enterprises are directed to implement these Aligned Short Sale Policies.

Defs' Mem. Ex. A. The email seems somewhat of a red herring as it makes no reference to the ALT or Make-Whole restrictions,[2] and was sent in 2012, two years after the GSEs began implementing the ALT restriction. Furthermore, the email is only directed to short (pre-foreclosure) sales, and thus does not implicate the Make-Whole restriction, which is applicable only to REO sales.[3]

Defendants' more viable counter-argument is that the application of HERA's Anti-Injunction Clause is not limited to instances in which the FHFA issues formal directives. Rather, by its own terms, it extends to any "exercise of powers or functions of [FHFA] as a conservator." 12 U.S.C. § 4617(f). The FHFA, for its part, has adopted the policy and rationale of the GSEs with respect to the ALT and Make-Whole requirements. In a January of 2013 letter to the Commonwealth, the FHFA's General Counsel made it

---

[2] Although the email references certain Aligned Short Sale Policies, these were not submitted for the court's consideration.

[3] Perhaps the more salient argument, as the court noted at the hearing, is the implicit acknowledgement by the Commonwealth that the FHFA's General Counsel (who was seated at counsel table) has the authority to issue policy directives, and if there is a procedural deficiency in the issuance of the ALT and Make-Whole restrictions, could remedy it tomorrow, presumably *nunc pro tunc.*

clear that the FHFA endorses the restrictions: "FHFA . . . believe[s] that the requirement for an affidavit that the sale is an arm's length transaction helps to prevent mortgage fraud and protect homeowners and communities." Defs.' Mem. Ex. D at 2. As is also evident, the FHFA is vigorously defending Freddie Mac and Fannie Mae against the Commonwealth's lawsuit. Thus, the FHFA "acts" by affirmatively supporting the continued application of the restrictions.[4]

The Commonwealth next argues that even if the FHFA acted, it did so outside its limited authority as a conservator, but instead in its capacity as the GSEs' regulator. The Commonwealth is certainly correct in its assertion that that "[t]he FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp." *Leon Cnty.*, 700 F.3d at 1278. Rather, "[the court] must consider all relevant factors pertaining to the directive to determine whether it was issued pursuant to the FHFA's powers as conservator or as regulator." *Id.* As the GSEs' regulator, the FHFA is tasked with, *inter alia*, "overseeing[ing] the[ir] prudential operations;" and to ensure that they "operate[] in a safe and sound manner, . . . [that they] foster liquid, efficient, competitive, and resilient national housing finance

---

[4] The Commonwealth's reliance on the act/non-act distinction is more metaphysical than experiential as nothing in HERA suggests that only a formal directive of the FHFA constitutes an "act" of conservation.

markets . . . and [that they] operate[] [in a manner] consistent with the public interest."[5] 12 U.S.C. § 4513(a)(1)(A)-(B). In contrast,

> [a] conservator is one who has been given the legal authority to establish control of an entity to put it in a sound and solvent condition. Essentially, the powers of the directors, officers, and shareholders of the entity in conservatorship are transferred to the conservator, and those powers include marshaling, protecting, and managing assets.

*Leon Cnty.*, 700 F.3d at 1278-1279.

The Commonwealth attempts, unsuccessfully in the court's view, to seize on a distinction noted by the Eleventh Circuit in its *Leon County* PACE decision. As the Eleventh Circuit observed, the FHFA directive regarding the PACE program

> did not establish a general set of criteria to be applied across the board by Fannie Mae and Freddie Mac to their mortgage transactions in general. A directive in that form would have the mark of a regulation. The directive at issue here, by comparison, does not contain any indicia of a general regulation and looks more like a discreet management decision by a conservator.

*Id.* The Commonwealth argues that the ALT and Make-Whole restrictions bear the stigma of broad rulemaking because they apply willy-nilly to all pre-foreclosure and REO sales.

---

[5] When the FHFA promulgates rules in its role as the GSEs' regulator, it must adhere to the notice and public comment requirements of the Administrative Procedure Act of 1946.

Defendants, for their part, characterize the ALT and Make-Whole restrictions as "protective measures against perceived risks [that fall] squarely within FHFA's power as conservator." *Town of Babylon*, 699 F.3d at 227. In other words, purpose, rather than labels, determines whether the FHFA in any given instance is acting as a regulator or as a conservator. As the Second Circuit aptly cautioned, "[e]ven if FHFA's powers as a regulator and conservator overlap, the exclusion of judicial review over the exercise of the latter would be relatively meaningless if it did not cover an FHFA directive to an institution in conservatorship to mitigate or avoid a perceived financial risk."[6] *Id.* at 227-228.

Courts have uniformly held that the FHFA is acting as the GSEs' conservator when it evaluates the risks of certain business transactions and takes prudential action to avoid those that it deems undesirable.

> The Enterprises' business is to purchase and securitize mortgages, and FHFA carries on that business when it weighs the relative risks and benefits of purchasing classes of mortgages for investment. When FHFA decides not to purchase a class of mortgages that it believes pose excessive risk, it is attempting to preserve and conserve the Enterprises' assets and property. Indeed, careful management of its mortgage purchase decisions appears to be the only way FHFA can avoid

---

[6] To the extent that the ALT and Make-Whole restrictions were instituted to mitigate a particular financial risk, they can also be characterized as "a discreet management decision by a conservator." *Leon Cnty.*, 700 F.3d at 1278.

the financial problems which precipitated the Enterprises' conservatorship.

*Cnty. of Sonoma*, 710 F.3d at 993; *see also Leon Cnty.*, 700 F.3d at 1279 ("Part of managing the assets and assuring the solvency of a mortgage-purchasing entity is considering the degree of risk entailed by the acquisition of particular mortgages.").

Defendants submit that the financial risk in selling pre-foreclosure and REO homes to nonprofit buyback programs is not that the GSEs might lose the opportunity to sell a home at a higher price to another buyer. Rather,

> there are concerns that in many cases, the[] borrowers were eligible for a loan modification that they would avoid in order to secure a repurchase from a nonprofit at a larger discount and without other obligations that exist, including second liens. This would run counter to federal and state efforts to provide homeowners an "affordable" alternative to foreclosure; these programs are not designed to provide [the] "cheapest" program as that result would increase costs to taxpayers and to neighborhoods through further depressed home prices.

Defs.' Mem. Ex. D. at 2-3. In other words, defendants' concern is that a distressed homeowner might opt to submit to an otherwise avoidable foreclosure on a mortgage in anticipation of later repurchasing the home at a lower price from the non-profit intermediary entity.

Because defendants have articulated a potential risk of financial loss in abiding by the restrictions of the Non-Profit Buyback Provision, the

decision to reject these terms may be fairly characterized as a business judgment intended to "preserve and conserve [the GSEs'] assets and property." 12 U.S.C. § 4617(b)(2)(D)(ii). Congress, by enacting HERA's Anti-Injunction Clause, expressly removed such conservatorship decisions from the courts' oversight.[7] Given the jurisdictional bar,[8] this court does not have the authority to reach the merits of the Commonwealth's claims.

---

[7] However well intended the stated goals of programs like the SUN Initiative, Congress has removed from the purview the court the power to second-guess the FHFA's business judgment. *See Perry Capital LLC v. Lew*, 2014 WL 4829559, at *9 (D.D.C. Sep. 30, 2014) (HERA is "a statute of exceptional scope that g[ives] immense discretion to FHFA as a conservator.").

[8] Even if the court were to agree with the Commonwealth's contention that HERA's Anti-Injunction Clause does not preclude this suit, the Complaint would likely fail a preemption analysis. Federal law preempts state laws that are in "irreconcilable conflict" with a federal statute. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996). An "irreconcilable conflict" exists where "[c]ompliance with both statutes . . . may be a physical impossibility . . . or, the state law may stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). Congress intended the FHFA to "exercise [its] rights, powers, and privileges" as conservator without being "subject to the direction or supervision of any other agency of the United States or *any State*." 12 U.S.C. § 4617(a)(7) (emphasis added). These "rights, powers, and privileges" expressly include the "transfer or s[ale of] any [GSE] asset . . . without any approval, assignment, or consent." *Id.* § 4617(b)(2)(G). The power to freely dispose of property necessarily encompasses the power *to not* dispose of property. The Non-Profit Buyback Provision of the Foreclosure Law is in direct conflict with Congress's intent that the FHFA

## ORDER

For the foregoing reasons, defendants' motion to dismiss is <u>ALLOWED</u>. The Clerk is directed to close this case.

                                    SO ORDERED.

                                    /s/ Richard G. Stearns
                                    _____
                                    UNITED STATES DISTRICT JUDGE

---

has the ability to dispose (or not to dispose) of GSE property as it sees fit. *See Fed. Hous. Fin. Agency v. City of Chicago*, 962 F. Supp. 2d 1044, 1060-1061 (N.D. Ill. 2013) (City of Chicago's ordinance requiring registration and maintenance of vacant buildings is preempted by HERA because it conflicts with the FHFA's ability to "take action as may be appropriate to carry on [the GSEs' business] and preserve and conserve [their] assets and property without being subject to the direction or supervision of any other agency of the United States or any State.") (internal quotation marks and citation omitted).